UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CHARLES JONES,

    Plaintiff,

v.                                         Case No. 04-3146

DR. MESROBIAN, DONNA
DREW, DR. TULYASATHIEN,
DOUG HOYLE, JERRY STERNES,
TERRI ANDERSON, DR. WILLARD
ELYEA, DR. ANDRIAN FEINERMAN,
DEAN BLADES, MELODY FORD,
HEALTH PROFESSIONALS LTD.

    Defendants.

### Order

    Before the court are motions for summary judgment by the remaining defendants (d/e's 87, 98) and by the plaintiff (d/e 101). For the reasons below, the court grants summary judgment to the defendants and closes this case.

    Defendants Dr. Mesrobian, Dr. Feinerman, and Health Professionals, Ltd., settled with the plaintiff and were dismissed pursuant to stipulation on January 23, 2006 (d/e 127). Their pending motion for summary judgment was therefore denied as moot and is not considered herein. The defendants remaining are: Drew, Hoyle, Sternes, Anderson, Elyea, Blades, Ford, and Dr. Tulyasathien.

### Standard

    A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);Fed. R. Civ. P.56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985). A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v.*

1

*Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).

Undisputed Facts[1]

1. Plaintiff at all relevant times was an inmate incarcerated within the Illinois Department Corrections at Dixon Correctional Center ("Dixon") and Pinckneyville Correctional Center Pinckneyville").

2. Defendant Donna Drew was the Health Care Administrator at Dixon at all relevant times. Her duties were administrative duties in supervising the Health Care Unit and staff. She is a registered nurse, not a physician. Final clinical decisions and medical orders rest with the designated physician or the medical director. The plaintiff does not dispute this, but he asserts that Drew's duties included monitoring the performance of those physicians.

3. Defendant Doug Hoyle was the Grievance Officer at Dixon at all relevant times. Hoyle has no training or background in the medical field. The plaintiff does not dispute this, but he says it is immaterial.

4. Defendant Jerry Sternes was the Chief Administrative Officer or Warden of Dixon commencing on January 1, 2002 until July 16, 2004.

5. Defendant Terri Anderson was a member of the Administrative Review Board at all relevant times, and is the Manager of the Office of Inmate Issues for the Illinois Department of Corrections. Anderson does not have any knowledge in medical treatment or medical training for bunions. The plaintiff does not dispute this, but he says it is immaterial.

6. Defendant Dr. Willard Elyea was the Medical Director of the Illinois Department of Corrections at all relevant times. His is also a medical doctor licensed to practice medicine in the
State of Illinois. His duties include supervising the office of health services, monitoring the provisions of health services in adult and juvenile facilities which includes over 40,000 inmates, and reviewing and monitoring health care budget requests.

7. Defendant Melody Ford was a member of the Administrative Review Board at all relevant times. She is the Chairperson for the Office of Inmate Issues for the Illinois Department of Corrections. Ford does not have any knowledge in medical treatment or medical training for bunions. The plaintiff does not dispute this, but he says it is immaterial.

---

[1]The undisputed facts are taken from those proposed by defendants (d/e's 88, 98) to the extent agreed to by the plaintiff, (d/e's 115, 117), and from the plaintiff's motion for summary judgment documents (d/e's 101, 102) where supported by his cites to the record. Additionally facts are also taken from the exhibits submitted in support of the summary judgment motions, where need for clarification. The parties' disputes are noted.

8. Defendant Dean Blades was the Grievance Officer at Pinckneyville at all relevant times. Blades has no training or background in the medical field. The plaintiff does not dispute this, but he says it is immaterial.

9. Defendant Dr. Tulyasathien (sometimes referred to as "Dr. Tuly") was an independent contractor, providing orthopedic services to IDOC inmates pursuant to a contract with Health Professionals, Ltd., at all relevant times.

10. Since at least 1996, Plaintiff has suffered from "Hallux Abductor Valgus" (bunions). He first sought treatment in 1996, and he maintains that his condition progressively worsened until he finally received surgery in January, 2005. It is the defendants' alleged failure to treat that condition that is at issue here.

11. Plaintiff was incarcerated at Graham Correctional Center ("Graham") from November 24, 1998 through March 6, 2002. While at Graham, Plaintiff played basketball a couple of times a month and worked out, lifting weights. In addition, while at Graham, Plaintiff worked in the commissary every day, five days a week from 9:00 am to 2:30 pm, standing behind a counter and retrieving items for inmates who requested them from the commissary. Plaintiff worked in the commissary from June 26, 2001 through March 6, 2002. Plaintiff also participated in college courses at Graham from August 21, 2000 through March 7, 2001, and was an education aide from July 28, 2000 through May 10, 2001.

12. In 1998, the plaintiff was referred to Dr. Sinha, who recommended surgery on Plaintiff's left big toe. Dr. Sinha's consultation report stated: "Patient has moderate to severe hallux valgus, more symptomatic on the left side. Recommendations/Plans: Chevron osteotomy of the left big toe which can be done as an out-patient under arm block." (d/e 88, p. 22).

13. Dr. Dhupelia, the medical director at Pontiac Correctional Center in 1998, denied surgery, noting "chronic condition." (d/e 88, p. 22). The plaintiff sued Dr. Dhupelia. In November, 2001, Dr. Dhupelia settled out of court before the trial and was dismissed pursuant to stipulation. (d/e 117, p. 4, ¶ 6); *Jones v. Gilmore*, 99-3002 (C.D. Ill., Baker, J.). Counsel was appointed for the plaintiff in that case, and a jury verdict was rendered for the remaining defendants in November, 2001. While this case regards the same medical condition and some of the same evidence (namely Dr. Sinha's recommendation), it is against different defendants and involves alleged denials of treatment occurring after the *Jones v. Gilmore* case.

14. Dr. Sinha explained the reason for his surgery recommendation in his deposition taken in *Jones v. Gilmore* (d/e 117, p. 10):

> Q. Can you explain why you made the recommendation that you did on May 20, 1998 in regard to Charles Jones?
>
> A. I think in my personal–I've been in orthopedic for 20 years now, and I have done–I do foot surgery quite often. And in my opinion, he–I think he needed it. I

3

think he had a moderate amount of bunion deformity.  He has tried all of those
shoe modifcation [sic] in the past.  And he was more symptomatic, he claimed
that he was getting more symptom [sic].  And definitely with the X-ray, I can tell
that, you know, this case needs operation, so I recommended it.  (d/e 117, p. 10, p.
20-30 of dep).

                    *              *              *

In my practice if the patient–if I'm the guy who's seeing the patient first time, and
he was not seen by any other doctor and not tried any other kind of treatment, I
would recommend bunion pad, some anti-inflammatory medication, some long
soaks, and shoe modification.  And try for few months or few weeks, and if they
don't have any improvement for several months or several weeks, depending on
how much symptom they have, how bad the deformity, then I'll say, well, we
tried everything, and you have enough deformity as seen in the X-ray and
clinically, then I would recommend for operation.  In this case, I recommended
for the operation.  (d/e 117, p. 10, p. 31 of dep).

I always, 100 percent time, I always try conservative treatment and try for weeks
and weeks and months and months.  Because this is not a life-threatening
condition, it's not like, you know, it's going to kill, it's not a cancer.  It's a very
common problem, million of people are walking the street with a bunion
deformity.  They don't die from this.  But depends on how many symptom, how
much deformity he has. . . . (d/e 117, p. 10, p. 32).

    15.  Plaintiff was incarcerated at Dixon from March 6, 2002 through February 11,
2004.  Dr. Mesrobian was the Medical Director at Dixon.  While incarcerated at Dixon, Plaintiff
played basketball a couple of times a month and worked out, lifting weights.  He also worked as
a porter or janitor from May 26, 2002, to January 16, 2004, cleaning, mopping and sweeping.  As
to the basketball, the plaintiff  "used to play basketball three or four times a week.  Due to my
condition I could only play once or twice a month.  This came with harsh penalties.  Soreness
and often the blisters would bleed through my socks when they burst.  I would be sore for a week
or so until the blisters healed and my knees stopped hurting."  (d/e 117, p. 7).

    16. When grievances were filed regarding medical issues, the Director of Nursing
or Nursing Supervisors would review the medical records and then discuss the grievance
with the Counselor handling the grievance.

    17. Defendant Hoyle handled Plaintiff's Grievance dated May 1, 2002 regarding bunions
(filed at Dixon).  To respond to this grievance, Defendant Hoyle contacted the health care unit.
In his affidavit, he averred contacting Annette Widener, Director of Nursing.  Plaintiff says
Hoyle is lying because Hoyle could not remember who he contacted when answering
interrogatories.  The plaintiff does not dispute, however, that Hoyle consulted someone in health
care in response to the grievance.  The plaintiff also does not dispute Hoyle's reliance on a

response by the health care unit that "Dr. can find no court order and not even any recommendation that his bunions need surgery. His condition is stable and no surgery is indicated. He needs to were the wider shoes issued by Graham to avoid excess pressure on his bunions. No other treatment is indicated at this time." (d/e 88, p. 24). Hoyle recommended denial of the grievance, and the warden concurred. (d/e 88, p. 23). Defendant Anderson denied the grievance on appeal. Plaintiff argues that Hoyle would have clearly seen Plaintiff's need for surgery had Hoyle reviewed Plaintiff's medical records.

      18. According to the medical records, Plaintiff was seen in the health care at Dixon on March 1, 2002; March 5, 2002; March 7, 2002; March 20, 2002; March 26, 2002; April 10, 2002; and July 8, 2002, wherein he was put in for a referral to the Rockford Orthopedic Clinic. Plaintiff was then seen on July 31, 2002, at the Orthopedic Clinic by Dr. Tuly.

      19. On July 31, 2002, Defendant Dr. Tulyasathien performed his first and only examination of Plaintiff, Charles Jones. Dr. Tuly examined Plaintiff because he signed a Medical Services Agreement with Health Professionals, LTD, (HPL) on January 1, 1998. This agreement obligated Dr. Tuly to provide orthopedic "[m]edical services at Dixon Correctional Center" as an independent contractor. According to the contract, Dr. Tuly was not an employee of HPL, but instead was paid an hourly rate for "working on various projects for HPL." (d/e 101, Medical Services Agreement attached). Dr. Tuly could only take on new patients as approved by HPL.

      20. At the plaintiff's visit with Dr. Tuly, x-rays were taken, and Dr. Tuly examined the plaintiff's bare feet and had the plaintiff walk a short distance barefoot. (d/e 98, Plaintiff's dep., p. 155).

      21. The plaintiff told Dr. Tuly that he had been wearing wide-toed shoes and arch supports for years and it had not helped his condition. Dr. Tuly did not note this in his report. (d/e 117, p. 5, ¶ 18, inference drawn in favor of the plaintiff at summary judgment stage). The plaintiff asserts Dr. Tuly never reviewed Plaintiff's medical records.

      22. Dr. Tuly wrote a "Report of Consultation" for defendant Dr. Mesrobian, signed on August 7, 2002. The Report reads as follows:

> The patient was seen on July 31, 2002 complaining of having pain in both feet due to severe bunions of both feet. The patient stated that he had bunions for some time causing pain in both feet. When he was at Pontiac Correctional Center he was seen by the orthopedic surgeon there and was recommended to have surgery to both feet to correct the bunions but he transferred to Dixon Correctional Center. He continued having pain in both feet so he was referred to the Orthopedic Clinic.
> Examination shows severe pronation of the left foot on standing with the left ankle thrusting inward and there was marked hallux valgus deformity of the left big toe with the left toe overriding on the second toe. There was bony

prominence of the first metatarsal head region at the MP joint of the left big toe. There was restoration of the arch on non-weight bearing. There was also pronation of the right foot but not as bad as the left. Hallux valgus deformity of the right foot also noted but not as bad as the left foot. There was good circulation and sensation of both feet.

IMPRESSION: Severe pronation of both feet especially the left along with severe hallux valgus deformity of both feet.

TREATMENT: To be recommended is to have the patient use firm arch supports in shoes to correct pronation of both feet. Surgical correction may be considered, will refer the patient to Dr. Mesrobian for further management of the patient.

23. Dr. Tuly explained to Plaintiff that he was a contract employee and could not order surgery.

24. Dr. Tuly further explained the plaintiff' condition in his response to the plaintiff's interrogatories (d/e 102):

The inmate did have pronated feet with Hallux Valgus of both feet, worse on the left foot. The condition is common, genetic, ethnic, and common with advanced age. Those with genetic predisposition may realize symptoms as early as teenage years to early adulthood (in the twenties and the thirties). The conditions usually are asymptomatic but the most complaints are irritation to the foot around the first metarsal head region due to unfitted shoes.

Pronated feet usually come along with Hallux Valgus deformity and flat feet. The pronation of feet causing the weight to shift more to the inner half of the foot widening the first and second metatarsal ankle resulting lateral tilting of the big toe (Hallux Valgus). The person with pronated feet tends to walk with weight shifting more onto the inner half of the feet and will have difficulty walking on the outside of the feet.

25. Plaintiff received new, different arch supports after seeing Dr. Tuly, but no surgery. (d/e 98, Plaintiff's Dep., p. 156).

26. Dr. Mesrobian, medical director at Dixon Correctional Center when Dr. Tuly made his report, never communicated with Dr. Tuly about Plaintiff's condition or any of Dr. Tuly's findings.

27. Plaintiff was incarcerated at Pinckneyville from February 11, 2004 through August 18, 2004. Dr. Feinerman was a physical providing services to inmates at Pinckneyville at the time.

28. On June 17, 2004, Plaintiff filed another grievance about his feet. Defendant Blades is the Grievance Officer who handled that grievance. Dr. Feinerman responded to the grievance, stating that Plaintiff was seen on June 17, 2004 for his foot problem and was told to wear his state shoes and that improvement should be anticipated. Defendant Blades therefore concluded Plaintiff's issues had been addressed and recommended denial of the grievance. (d/e 88, pp. 25-27; d/e 52, attached exhibits). Defendant Ford sustained the denial on appeal.

29. Plaintiff was transferred to Illinois River Correctional Center ("Illinois River") on August 18, 2004 and remains incarcerated at Illinois River. From September 2004 to September 14, 2005, Plaintiff worked in the bakery in Illinois River Correctional Center. Plaintiff worked eight hours a day packaging baked goods.

30. Plaintiff saw Dr. Clark from the Pekin Orthopedic Center, in December, 2004. Dr. Clark's assessment states, "typical bilat bunions, symptomatic . . .suggest bunionectomy with metatarsal osteotomy" and "suggest one foot at a time . . .can be done as outpatient–general anesth-" (d/e 117, p. 14).

31. On January 19, 2005, Plaintiff had a bilateral bunionectomy and osteotomy. He describes his condition before surgery thus:

> My big toes was [sic] overlapping with the next toe angling inward almost forming a 45 degree angle. My feet was not angling like this at first when I first sought treatment in 1996. I noticed that altering the way I walked help alleviate some of the pain I had (walking on the outer part of my feet). However, this altered way of walking led to constant knee problems which I sought treatment for in Dixon. I often developed these painful pus-filled blisters on the bottom of my feet under my bunion and right on the bunion area. I also suffered from swelling and sever[e] soreness around my bunion areas despite wearing wide toed shoes, arch supports and altering my way of walking.

32. The plaintiff's big toes are still angled, even after surgery, but no longer overlap, and are "doing okay," in the plaintiff's words. (d/e 88, Ex. I, Plaintiff's Dep., p. 5).

33. The parties dispute whether Dr. Elyea was aware of the plaintiff's foot problems. Dr. Elyea avers he had no personal knowledge or involvement. (d/e 88, ¶ 3-5). The plaintiff avers that he wrote to Dr. Elyea about his problem in April, 2002, and that he served Dr. Elyea with a request for injunctive relief in October, 2002, as well as mailing a copy of his Pinckneyville grievance to him in 2004. (d/e 101, p. 6, ¶¶ 69-52). Dr. Elyea avers that he does not personally review inmate letters, but that staff screens correspondence and decides what should be brought to his attention. According to Dr. Elyea, he received no correspondence from his staff regarding the plaintiff's problems. (d/e 88, p. 39, ¶ 6).

34. Dr. Elyea also avers that:

7

> [e]ven if Plaintiff's medical concerns were brought to my attention, the conservative treatments Plaintiff received are standard and acceptable treatments for bunions. Plaintiff received wide toed shoes, pain medication and arch supports for his bunions. In addition, Plaintiff was referred to the Rockford Orthopedic Clinic for special made shoes. The recommended course of treatment for bunions, as in Plaintiff's case, is to utilize conservative measures.
>
> As long as bunions are not interfering with a patient's daily activities, surgery is not necessary and should be avoided. Surgery entails risks such as infection, recurrence, nonunion, wound healing problems, avascular necrosis, malunion and pain. Surgery is not a guarantee to correct the problems associated with bunions and if the patient's symptoms can be reduced through conservative means, surgery should be avoided.
>
> . . . if Plaintiff's condition was brought to my attention, the decision of whether to continue conservative treatment or to perform surgery is best made by a treating physician who has direct knowledge of the patient's condition. I would only intervene in this decision if it appeared that the treating physician was failing to provide any treatment consistent with my professional judgment. Nothing in Plaintiff's Amended Complaint indicates any such failure and I would not have intervened in this matter. . .  (d/e 88, p. 29-30, ¶¶ 6-8).

**Analysis**

The plaintiff had an arguably serious medical need, based on his description of the pain he experienced, and the fact that doctors had diagnosed him with a condition needing treatment. Deliberate indifference is also inferred, for purposes of this order. Each time the plaintiff was sent to an outside consultant, that consultant recommended (or "suggested" or "considered") surgery for the plaintiff's condition. *See Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997)("delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims."); *Gil v. Reed*, 381 F.3d 649, 663-64 (7th Cir. 2004)(prison doctor's decision not to follow an outside specialist's recommendations might raise an inference of deliberate indifference).[2]

But the bottom line is that the defendants who were responsible for responding to that need have settled with the plaintiff and have been dismissed from this case. (d/e's 124-127). Drs. Feinerman and Mesrobian were the doctors with personal knowledge of the plaintiff's condition *and* the authority to do something about it. Questions and recommendations about the plaintiff's condition were referred to and decided by them. The remaining defendants cannot be

---

[2]Mesrobian and Feinerman vigorously dispute any deliberate indifference in their summary judgment motion (denied as moot), but the court must draw reasonable inferences in the plaintiff's favor.

8

held liable for the alleged failures of Drs. Feinerman and Mesrobian to approve surgery, at least not on the present record.[3]

The non-medical defendants (the grievance officers, warden, and ARB members) did not have the expertise to second-guess the doctors' decisions here. The recommended treatment for the plaintiff's condition would not be obvious to a layperson, though the plaintiff's need for different treatment may have been obvious to him. The plaintiff's condition was chronic and readily observable, but he was seeing doctors for it regularly. Further, the plaintiff was functioning despite his feet–he was working, taking classes, and sometimes exercising. No inference of an obviously untreated and serious medical condition arises, at least from a layperson's eyes.

Defendant Drew, the health care administrator at Dixon, did have medical training as a registered nurse, but she did not have the authority to override Dr. Feinerman's treatment decisions. In responding to the plaintiff's grievance, Dr. Feinerman told the plaintiff to wear his "state shoes." Even assuming that decision was deliberately indifferent, it was Dr. Feinerman's call, not defendant Drew's. What evidence is there that Drew should have known Dr. Feinerman's decisions were so far below the standard of care that she must intervene? None. Outside consultants had recommended surgery in 1998 and (arguably) again in 2002, but both of those recommendations had been denied by medical directors at other prisons. There is no evidence that Dr. Feinerman's decision to follow the same course should have raised red flags to Drew (in a constitutional, deliberate indifference sense).

Defendant Dr. Elyea, IDOC's Medical Director, would have had the authority to intervene if he believed "the treating physician was failing to provide any treatment consistent with my professional judgment." Yet there is no evidence that Dr. Elyea knew this might be happening. The court believes a reasonable inference does arise that Dr. Elyea knew about the plaintiff's complaints about his feet. However, Dr. Elyea did not examine the plaintiff personally; he relied on the physicians at the prisons to do that. The medical records showed that the plaintiff had received treatment from physicians across several prisons and several years, each continuing the same course of treatment. And, plaintiff's first lawsuit about his bunions resulted in a jury verdict against him. Assuming Dr. Elyea did know of the plaintiff's medical history, nothing about that history would have alerted Dr. Elyea to the possibility of substandard care. There is no evidence that Dr. Elyea's reliance on the treating doctors amounted to deliberate indifference, on the specific facts of this case.

As to Dr. Tulyasathien, the plaintiff faults him for an "inadequate consultation report." The plaintiff asserts that Dr. Tuly knew that the plaintiff had been wearing wide-toed shoes and arch supports for years, yet prescribed only firm arches, knowing they would not help. Plaintiff argues that Dr. Tuly failed to make a recommendation for surgery because of economic pressure

---

[3]Plaintiff says now he wasn't asking for surgery to be ordered, but he doesn't say what other options were left besides surgery.

from Health Professionals Limited. That is, if Dr. Tuly had unequivocally recommended surgery, HPL would have either had to pay for expensive surgery or risk legal liability for not following that recommendation. Plaintiff's implied argument is that an unequivocal recommendation for surgery would have resulted in an unhappy HPL, which would have resulted in HPL terminating its contract with Dr. Tuly, which would have resulted in loss of income to Dr. Tuly.[4]

The plaintiff's conclusion that Dr. Tuly changed his professional recommendation to keep HPL happy is tenuous, on the present record. He was not an employee of HPL. He did receive hourly payment for services to HPL, but there is nothing in the record regarding how much his practice relied on income from HPL.

Additionally, Dr. Tuly is liable under the Eighth Amendment only if his diagnosis and recommendation was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances.").

Dr. Tuly examined the plaintiff just once, and there is no reasonable inference of deliberate indifference arising from that one examination or Dr. Tuly's consultation report. Dr. Tuly took x-rays, examined the plaintiff's bare feet, and had the plaintiff walk bare foot. In his report, Dr. Tuly described the plaintiff's deformity as severe, recommended firm arch supports, and stated surgery "may be considered." The plaintiff received those arch supports, and they did not help, but Dr. Tuly did not get another chance to see the plaintiff. Further, Dr. Tuly's statement "may consider surgery" is not much different from Dr. Clark's report "suggest[ing]" surgery: Dixon did not act on the former, but Illinois River did act on the latter. A more strongly-worded report by Dr. Tuly may (or may not) have resulted in the plaintiff getting surgery sooner, but there is no evidence that the choice of words used by Dr. Tuly in his report amounted to deliberate indifference to the plaintiff's condition.[5]

IT IS THEREFORE ORDERED that the defendants' motions for summary judgment are

---

[4] On the other hand, outside medical consultants for inmates may also have an equal, opposing motivation to err on the side of "defensive medicine"–recommending tests and procedures that aren't truly medically necessary– in order to protect them from lawsuits like this one.

[5] Dr. Tuly could not "order" Dr. Mesrobian or the prison to do anything. All Dr. Tuly could do was make a recommendation based on his professional expertise and experience.

granted (d/e's 87, 98); the plaintiff's motion for summary judgment is denied (d/e 101); defendant Dr. Tulyasathien's motion to dismiss is denied as moot (d/e 75). All other pending motions are denied as moot, and this case is closed, parties to bear their own costs.

Entered this 10th Day of March, 2006.

                                                        **s\Harold A. Baker**

                                                      HAROLD A. BAKER
                                   UNITED STATES DISTRICT JUDGE